UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

MARTENEZ WISE,

                    Plaintiff,                    Case No. 2:21-cv-132

v.                                                Hon. Hala Y. Jarbou

HEIDI WASHINGTON, et al.,

                    Defendants.
_____/

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the

Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is

required to dismiss any prisoner action brought under federal law if the complaint is frivolous,

malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a

defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The

Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520

(1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly

incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will

dismiss Plaintiff's complaint for failure to state a claim.

I.    **Factual allegations**

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC)

at the Kinross Correctional Facility (KCF) in Kincheloe, Chippewa County, Michigan. The events

about which he complains occurred at that facility. Plaintiff sues MDOC Director Heidi

Washington; Correctional Facilities Administration (CFA) Deputy Directors Joan Yukins and Ken McKee;[1] and KCF Warden Mike Brown.

Plaintiff alleges that the COVID-19 pandemic posed a serious health risk to MDOC prisoners, particularly those prisoners who were housed in a "pole barn prison setting." (2d Am. Compl., ECF No. 24, PageID.350–51.)[2] Plaintiff alleges that Defendants were aware of the serious health risk. Plaintiff contends that Defendants failed to adopt all of the recommendations posted by the Centers for Disease Control (CDC) or watered down the recommended preventive measures. Moreover, when Defendants adopted appropriate measures, they failed to adequately prevent MDOC staff from declining to follow them. Plaintiff notes that Defendants failed to use "quick" tests to screen out sick employees, allowed employees with symptoms to enter KCF, allowed alcohol-based hand sanitizers for MDOC employees—but not prisoners, required officers to be present when prisoners used bleach to clean surfaces, imposed social distancing requirements that officers ignored, did not accommodate social distancing in 8-prisoner cubicles, transferred nine prisoners known to be infected with COVID-19 from Marquette Branch Prison to KCF, did

---

[1] It appears that Defendant McKee retired before the COVID-19 virus made its way into KCF.  *See* Corrections Connection, Vol. 32, Issue 5, p.9 MDOC Office of Public Information and Communications (Sept. 2020) available at https://www.michigan.gov/documents/corrections/CC_SeptemberNewsletter2020_703540_7.pdf (last visited Mar. 13, 2022). It appears that Defendant Joan Yukins may have also retired.

[2] This action was severed from *Good et al. v. Washington et al.*, No. 2:21-cv-18 (W.D. Mich.). The initial *Good* complaint was filed on behalf of five plaintiffs, including Plaintiff Wise. The *Good* plaintiffs filed an amended complaint almost immediately after they filed their initial complaint. The amended complaint added two plaintiffs. The seven plaintiffs attached 17 sworn statements to the amended complaint, as well as other documents. When the Court severed the one case into seven, each plaintiff was directed to file an amended complaint setting forth his claims. The plaintiffs were advised, however, that they could rely on the exhibits previously filed. Each plaintiff filed a virtually identical second amended complaint. In determining whether Plaintiff Wise has stated a claim, the Court relies on his second amended complaint (ECF No. 24) and the exhibits attached to the first amended complaint (ECF Nos. 3-1 through 3-23).

not make nursing staff perform rounds until a unit was placed on quarantine status, and failed to secure vitamins in advance of infection to boost immune systems.

Plaintiff identifies several different ways that the virus may have entered KCF during late October and early November of 2020. Plaintiff reports that Officer Baker was "allowed to enter the facility for nearly ten days while infected with COVID-19." (*Id.*, PageID.353–54.)[3] Similarly, Prison Counselor McDowell was exposed when his wife was infected, but she was sick for a week before McDowell was tested and directed to leave the facility when the test came back positive. (*Id.*)[4] Additionally, the complaint alleges that Plaintiff Wise "personally observed CO Ogle enter the unit noticeably sick with many of the symptoms attributable to an infection with COVID 19." (*Id.*) The complaint cites Wise's affidavit (ECF No. 3-6), but the affidavit does not say anything about Officer Ogle. Plaintiff Wise's "Declaration" mentions her. (ECF No. 3-9, PageID.163.) The symptoms he saw were coughing, wiping her nose, and sneezing. (*Id.*) Finally, Plaintiff reports that "numerous officers were allowed to enter the facility with COVID-19." (2d Am. Compl., ECF No. 24, PageID.354–55.) He specifically lists Officers Johnson and Cairns, "each tested on November 17, 2020, but did not receive their positive results until days later." (*Id.*) The Court will refer to the potential of infection through the KCF officers and prison counselor as the "staff vector."

---

[3] Plaintiff's complaint does not fix a date for this ten-day stretch, but the attached affidavit of Nicholas Dobson referenced in the complaint indicates that, on a day "in early November," Officer Baker, who exhibited symptoms of coughing and blowing her nose, was removed from the unit and told to leave the facility because her test results came back positive. (Aff. of Nicholas Dobson, ECF No. 3-2, PageID.135.) Three days later, the unit residents began to experience symptoms and tested positive for COVID-19. (*Id.*)

[4] The complaint also fails to identify the date that McDowell was compelled to leave, but the attached affidavit of Jonathan Good discloses that McDowell first did not come to work on November 11, 2020. (Aff. of Jonathan Good, ECF No. 3-5, PageID.147.)  Plaintiff Wise, on the other hand, recalls that the first day McDowell did not come to work was the Friday before November 15, which was November 13.  (Aff. of Martenez Wise, ECF No. 3-6, PageID.151.)

The staff vector was not the only potential source of COVID-19 infection for the KCF prisoners. On October 28, 2020, nine prisoners were transferred from Marquette Branch Prison to KCF. Plaintiff identifies five of those prisoners in the second amended complaint: Richard Kimble, Vincent Carter, Victor Schalk, Curtis Thomas, and Michael Russell. (*Id.*, PageID.358.) According to Plaintiff, "on October 2, 2020[,] there was mass testing at the Marquette Branch Prison." (*Id.*) All of the identified prisoners received a positive test result on October 8, 2020.[5] Plaintiff suggests that the transferred prisoners may have also been the means by which the COVID-19 virus entered KCF (the transferred prisoner vector).

Marquette transfer Richard Kimble was moved into Plaintiff's unit on October 31, 2020. (*Id.*, PageID.359–60, 362.) Plaintiff suggests that he might have been exposed to the virus from Kimble on November 5 and again later in November when Plaintiff gave Kimble haircuts. (*Id.*, PageID.362.) Alternatively, Plaintiff notes, he came in contact with Prison Counselor McDowell on November 5. (*Id.*, PageID.362–363.) Plaintiff also exercised with prisoner Trinity Nelson who had come into contact with COVID-19 positive Corrections Officer Headly. (*Id.*, PageID.363.) On November 20, Plaintiff learned he tested positive.  (*Id.*, PageID.363.) Although Plaintiff overcame the initial symptoms quickly,[6] he reports that since the infection his lungs have burned if he runs a long distance. (*Id.*, PageID.364); *see also* (Pl.'s Decl., ECF No. 3-9, PageID.165).

Plaintiff seeks hundreds of thousands of dollars in compensatory and punitive damages. Plaintiff also seeks unspecified injunctive relief.

---

[5] Vincent Carter reports that he also received a positive test result on October 20, (Aff. of Vincent Carter, ECF No. 3-10, PageID.176), but he does not reveal when he took that test.

[6] Plaintiff Wise avers "[o]n November 20, 2020[,] I woke to no noticeable symptoms . . . ." (Pl.'s Aff., ECF No. 3-6, PageID.151.)

## II.     Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to

identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Plaintiff contends that Defendants violated Plaintiff's Eighth Amendment rights.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

Plaintiff contends that Defendants were deliberately indifferent to the risk posed by the COVID-19 pandemic. In order for a prisoner to prevail on an Eighth Amendment deliberate indifference claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong,

6

an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

### A.    Objective prong

In a 2020 case brought by federal prisoners under 28 U.S.C. § 2241, the Sixth Circuit addressed the issue of whether the Bureau of Prisons (BOP) violated the Eighth Amendment rights of medically vulnerable inmates at the Elkton Federal Correctional Institution by failing to adequately protect them from COVID-19 infection. *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020). In the opinion, the Sixth Circuit found that the plaintiffs in *Wilson* had easily satisfied the objective component of an Eighth Amendment claim:

> The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death. The BOP acknowledges that "[t]he health risks posed by COVID-19 are significant." CA6 R. 35, Appellant Br., PageID 42. The infection and fatality rates at Elkton have borne out the serious risk of COVID-19, despite the BOP's efforts. The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death. Petitioners have put forth sufficient evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

*Id.* at 840.

Under that precedent, a medically vulnerable plaintiff may satisfy the objective prong by alleging conditions that could facilitate COVID-19 transmission within a prison and the health risks posed by the virus. Plaintiff alleges conditions that could facilitate COVID-19 transmission within KCF, but Plaintiff does not state that he suffers from a condition that makes him medically

vulnerable. Nonetheless, at this early stage, the Court concludes that Plaintiff alleges facts sufficient to satisfy the objective prong of the deliberate indifference test.

### B.     Subjective prong

Notwithstanding Plaintiff's ability to satisfy the objective prong, he fails to allege facts sufficient to satisfy the subjective prong of the deliberate indifference test. The Sixth Circuit went on in *Wilson* to address the subjective prong of an Eighth Amendment claim, noting that the pertinent question was whether the BOP's actions demonstrated deliberate indifference to the serious risk of harm posed by COVID-19 in the prison:

> There is no question that the BOP was aware of and understood the potential risk of serious harm to inmates at Elkton through exposure to the COVID-19 virus. As of April 22, fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died. "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-19 and implemented a six-phase plan to mitigate the risk of COVID-19 spreading at Elkton.
>
> The key inquiry is whether the BOP "responded reasonably to th[is] risk." *Farmer*, 511 U.S. at 844. The BOP contends that it has acted "assiduously to protect inmates from the risks of COVID-19, to the extent possible." CA6 R. 35, Appellant Br., PageID 42. These actions include
>
>> implement[ing] measures to screen inmates for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff.
>
> *Id.* at 42–43.
>
> The BOP argues that these actions show it has responded reasonably to the risk posed by COVID-19 and that the conditions at Elkton cannot be found to violate the Eighth Amendment. We agree.

8

Here, while the harm imposed by COVID-19 on inmates at Elkton "ultimately [is] not averted," the BOP has "responded reasonably to the risk" and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights. *Farmer*, 511 U.S. at 844. The BOP implemented a six-phase action plan to reduce the risk of COVID-19 spread at Elkton. Before the district court granted the preliminary injunction at issue, the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks. The BOP initially struggled to scale up its testing capacity just before the district court granted the preliminary injunction, but even there the BOP represented that it was on the cusp of expanding testing. The BOP's efforts to expand testing demonstrate the opposite of a disregard of a serious health risk.

*Id.* at 840–41.

In its decision, the Sixth Circuit recognized that other Sixth Circuit decisions have found similar responses by prison officials and medical personnel, such as cleaning cells, quarantining infected inmates, and distributing information about a disease in an effort to prevent spread, to be reasonable. *Id.* at 841 (citing *Wooler v. Hickman Cnty.*, 377 F. App'x 502, 506 (6th Cir. 2010); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014); *Harrison v. Ash*, 539 F.3d 510, 519–20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018)). The *Wilson* Court also noted that other circuits had concluded that similar actions by prison officials demonstrated a reasonable response to the risk posed by COVID-19:

In *Swain* [*v. Junior*], the Eleventh Circuit granted a stay of a preliminary injunction pending appeal on state inmates' Eighth Amendment claims. 958 F.3d [1081,] 1085 [(11th Cir. 2020) (per curiam)]. The Eleventh Circuit held that "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence,'" and "the evidence supports that [Metro West Detention Center ("MWDC") is] taking the risk of COVID-19 seriously." *Id.* at 1088–90 (citation omitted). In response to the pandemic in early March, MWDC began "cancelling inmate visitation; screening arrestees, inmates, and staff; and advising staff of use of protective equipment and sanitation practices" and, after reviewing further CDC guidance, began "daily temperature screenings of all persons entering Metro West, establish[ed] a 'COVID-19 Incident Command Center and Response Line' to track testing and identify close contacts with the virus, develop[ed] a social hygiene campaign, and mandate[d] that staff and inmates wear protective masks at all times." *Id.* at 1085–86. The Eleventh Circuit held that, because MWDC "adopted extensive safety measures such as increasing screening, providing protective

9

equipment, adopting [physical] distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures," MWDC's actions likely did not amount to deliberate indifference. *Id.* at 1090.

Similarly, the Fifth Circuit granted stays of two preliminary injunctions in *Valentine* [*v. Collier*, 956 F.3d 797 (5th Cir. 2020) (per curiam),] and *Marlowe* [*v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam)]. In *Valentine*, inmates at Texas's Wallace Pack Unit filed a class action suit against the Texas Department of Criminal Justice ("TDCJ") alleging violations of the Eighth Amendment. 956 F.3d at 799. In response to the COVID-19 pandemic, TDCJ had taken preventative measures such as providing "access to soap, tissues, gloves, [and] masks," implementing "regular cleaning," "quarantin[ing] of new prisoners," and ensuring "[physical] distancing during transport." *Id.* at 802. The Fifth Circuit determined that the district court applied the wrong legal standard by "collaps[ing] the objective and subjective components of the Eighth Amendment inquiry" by "treating inadequate measures as dispositive of the Defendants' mental state" under the subjective prong and held that "accounting for the protective measures TDCJ has taken" the plaintiffs had not shown deliberate indifference. *Id.* at 802–03. In *Marlowe*, the Fifth Circuit relied on its reasoning in *Valentine* and again reiterated that there was "little basis for concluding that [the correctional center's] mitigation efforts," which included "providing prisoners with disinfectant spray and two cloth masks[,] . . . limiting the number of prisoners in the infirmary lobby[,] and painting markers on walkways to promote [physical] distancing," were insufficient. 2020 WL 2043425, at *2–3.

*Wilson*, 961 F.3d at 841–42.

After reviewing the cases, the *Wilson* Court held that even if the BOP's response to COVID-19 was inadequate, it took many affirmative actions, not only to treat and quarantine inmates who had tested positive, but also to prevent widespread transmission of COVID-19. The Court held that because the BOP had neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment. *Id.* at 843–44.

In addition, in *Cameron v. Bouchard*, 818 F. App'x 393 (6th Cir. 2020), the Court relied on *Wilson* to find that pretrial detainees in the Oakland County Jail were unlikely to succeed on the merits of their Eighth and Fourteenth Amendment claims. The plaintiffs in *Cameron* claimed that jail officials were deliberately indifferent to the substantial risk of harm posed by COVID-19

at the jail. The district court initially granted a preliminary injunction requiring the defendants to "(1) provide all [j]ail inmates with access to certain protective measures and medical care intended to limit exposure, limit transmission, and/or treat COVID-19, and (2) provide the district court and Plaintiffs' counsel with a list of medically vulnerable inmates within three business days." *Id.* at 394. However, following the decision in *Wilson*, the Court granted the defendants' renewed emergency motion to stay the preliminary injunction, finding that the preventative measures taken by the defendants were similar to those taken by officials in *Wilson* and, thus, were a reasonable response to the threat posed by COVID-19 to the plaintiffs. *Id.* at 395. Subsequently, in an unpublished opinion issued on July 9, 2020, the Sixth Circuit vacated the injunction. *Cameron v. Bouchard*, 815 F. App'x 978 (6th Cir. 2020).

Michigan's Governor Gretchen Whitmer issued Executive Order 2020-20, on March 20, 2020, that announced the "first two presumptive-positive cases of COVID-19 in Michigan." (2d Am Compl., ECF No. 24, PageID.350.) The MDOC did not stand idly by. Plaintiff acknowledges that Defendant Washington issued a series of Director's Office Memorandums (DOMs) addressing the risks posed by the pandemic and the MDOC's efforts to mitigate that risk. (*Id.*, PageID.351.) Plaintiff particularly focuses on DOM 2020-30R4 issued August 10, 2020.[7] (*Id.*, PageID.351–53, 355–56.) But Defendant Washington issued many DOMs relating to COVID-19.

The Court notes that the MDOC issued its first COVID-19 DOM on April 8, 2020, and issued multiple revised DOMs on the subject to limit the threat posed by COVID-19.[8] *See* MDOC

---

[7] Plaintiff indicates at certain points in his complaint that DOM 2020-30R4 was issued on May 27, 2020. That appears to be an error. DOM 2020-30R3 was issued on May 27, 2020; it was superseded by DOM 2020-30R4. *See* MDOC DOM 2020-30R4, available at https://www.michigan.gov/documents/corrections/DOM_2020-30R4_Final_698953_7.pdf (last visited Mar. 13, 2022).

[8] The Court takes judicial notice of these facts under Rule 201 of the Federal Rules of Evidence. The accuracy of the source regarding this specific information "cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also* Paul F. Rothstein, *Federal Rules of Evidence* 49 (3d

DOM 2020-30 (eff. Apr. 8, 2020) (mandating multiple protective measures including the wearing of masks by prisoners and staff, screening of all individuals before entering prison facilities, keeping of social distance, restricting visits and phone calls, and limiting transfers and cell moves); DOM 2020-30R2 (eff. May 26, 2020) (outlining specific precautions to be taken by staff members, including the use of personal protective equipment and hand sanitizer); DOM 2020-30R3 (eff. May 27, 2020); DOM 2020-30R4 (eff. Aug. 10, 2020); DOM 2020-30R5 (eff. Aug. 25, 2020); DOM 2020-30R6 (eff. Aug. 27, 2020); DOM 2020-30R7 (eff. Nov. 5, 2020); DOM 2020-30R8 (eff. Nov. 24, 2020); DOM 2021-26 (eff. Jan. 1, 2021); DOM 2021-26R (eff. Jan. 12, 2021); DOM 2021-26R (eff. Jan. 12, 2021); DOM 2021-26R2 (eff. Jan. 21, 2021); DOM 2021-26R3 (eff. Jan. 25, 2021); DOM 2021-26R4 (eff. Mar. 5, 2021); DOM 2021-26R5 (eff. Mar. 19, 2021); DOM 2021-26R6 (eff. Mar. 26, 2021); DOM 2021-26R7 (eff. June 23, 2021); DOM 2021-26R7 (eff. June 23, 2021); DOM 2021-26R8 (eff. Aug. 6, 2021); DOM 2021-26R9 (eff. Aug. 23, 2021); DOM 2021-26R10 (eff. Oct. 11, 2021); DOM 2021-26R11 (eff. Nov. 19, 2021); DOM 2021-26R12 (eff. Dec. 3, 2021); DOM 2022-21R (eff. Jan. 11, 2022); DOM 2022-21R2 (eff. Jan. 14, 2022); DOM 2022-21R3 (eff. Jan. 18, 2022); DOM 2022-21R4 (eff. Jan. 24, 2022); DOM 2022-21R5 (eff. Feb. 9, 2022); DOM 2022-21R6 (eff. Feb. 15, 2022); DOM 2022-21R7 (eff. Feb. 28, 2022). The DOMs in effect during October and November of 2020 were DOM 2020-30R6, DOM

---

ed. 2019) (citing *Matthews v. NFL Mgmt. Council*, 688 F.3d 1107 (9th Cir. 2012) (taking judicial notice of statistics on the NFL website that the plaintiff played 13 games in California over 19 years); *Victaulic Co. v. Tieman*, 499 F.3d 227, 236–37 (3d. Cir. 2007), as amended (Nov. 20, 2007) (finding error where a district court took judicial notice of facts stated in "a party's . . . marketing material" on an "unauthenticated" website because marketing materials often lack precise and candid information and the source was not authenticated)). Moreover, "[t]he court may take judicial notice at *any* stage of the proceeding." Fed. R. Evid. 201(d) (emphasis added). Thus, the Court may take judicial notice even at this early juncture because the Court is permitted to take judicial notice *sua sponte*, Fed. R. Evid. 201(c)(1), and "the fact is not subject to reasonable dispute," Fed. R. Evid. 201(b).

2020-30R7, and DOM 2020-30R8. Each of those DOMs called for the wearing of personal protective equipment, screening of individuals before entering a facility, social distancing, the creation of isolation and quarantine areas—as resources permit—for prisoners who tested positive and prisoners under investigation for having COVID-19, isolation of the personal property of positive prisoners and prisoners under investigation, limitations of visitation and programs, the use of alcohol-based sanitizers and wipes by staff, limited transfers and cell moves, testing, adequate soap for hygiene and cleanliness, the use of bleach under staff supervision, no prisoner co-pays for COVID-19 testing and management, and remote work by staff when possible.

It is against that backdrop that the Court will consider Plaintiff's claims that these Defendants were deliberately indifferent to the risks posed by the COVID-19 pandemic.

### 1.    The Marquette transfers

Although Plaintiff claims that Defendants erred in many respects, the crux of Plaintiff's claim is that Defendants allowed the COVID-19 virus to enter the facility by transferring the nine COVID-19-positive prisoners from Marquette Branch Prison (the Marquette 9) to KCF on October 28, 2020, and then releasing them into the general population beginning October 31, 2020. Plaintiff's allegations regarding the transfer are directed to Defendants McKee and Yukins who both purportedly "had express authority over transfers of prisoners under the Covid-19 protocol." (2d Am. Compl., ECF No. 24, PageID.346–47.) Plaintiff's allegations regarding the subsequent release of the Marquette 9 into the general population are directed to Defendant Brown.

Accepting Plaintiff's allegations as true, they certainly appear incriminating on first inspection. To transfer COVID-19 positive prisoners from one facility where there is an outbreak to another facility where there is not would seem to be a dangerous course. But examination of all of Plaintiff's allegations, and the many affidavits he submits in support of his complaint, reveals that the allegations are not as incriminating as they seem at first blush.

13

Plaintiff's allegations make clear that the Marquette 9 were tested on October 2, 2020, and the tests came back positive. Plaintiff's submissions demonstrate, therefore, that on October 2, 2020, the Marquette 9 were COVID-19 positive. They were transferred to KCF 26 days later, on October 28, 2020. But they were not released into the general population until—at the soonest— October 31, 2020, and then only after a negative COVID-19 test. Thus, before the Marquette 9 were transferred, 26 days had passed after the positive tests. Additionally, before they were released into the general population, 28 days or more had passed after the positive tests. By the end of October 2020, CDC guidance regarding when a person could be around other people after having or likely having COVID-19 was less than 26 days. *See* CDC, *When You Can be Around Others After You Had or Likely Had COVID-19* (Oct. 27, 2020), https://www.cdc.gov/ coronavirus/2019-ncov/if-you-are-sick/end-home-isolation.html     [https://web.archive.org/web/ 20201113232734/https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/end-home-isolatio n.html]. Therefore, Plaintiff's factual allegations regarding the transfer of the Marquette 9 and their release into the KCF population do not support an inference that any of the Defendants was deliberately indifferent to the risks posed by the COVID-19 pandemic.

### 2.     Other claims

Plaintiff also alleges that the Defendants failed to implement policies that were as stringent as CDC recommendations and/or failed to ensure that policies implemented were followed. Plaintiff contends that the actions of "Defendants" were "inadequate" or "unreasonable." (2d Am. Compl., ECF No. 24, PageID.351.) Inadequacy and unreasonableness, however, are not necessarily the same thing as deliberate indifference.

Plaintiff claims that Defendant Washington "ignored many of the accepted protocols recommended by the Centers for Disease Control." (*Id.*, PageID.352.) Plaintiff claims that Yukins,

McKee, and Brown are culpable because they "watered down the recommendation[s]" or "they simply did not implement them at all." (*Id.*) Each "failure" is addressed below.

### a.      Pre-intake screening and temperature checks

Plaintiff acknowledges that Defendants Washington and Brown adopted a protocol that required screening and temperature checks of all staff, visitors, and prisoners who entered a correctional facility. (*Id.*) Nonetheless, he complains because the protocol did not succeed. He claims that corrections officers lied regarding their health status so that they could continue to earn a paycheck lest their families become "homeless, or impoverished." (*Id.*, PageID.353.) Plaintiff posits that Officer Baker, Counselor McDowell, Officer Ogle, Officer Johnson, and Officer Cairns may have introduced COVID-19 into KCF because of this shortcoming.

Plaintiff does not allege that either Defendant Washington or Defendant Brown was aware that these MDOC employees—or any MDOC employees—had entered the facility despite exhibiting symptoms of illness. Therefore, Plaintiff has failed to allege facts that support an inference that Washington or Brown was aware of a risk ___**and**___ disregarded that risk.

Plaintiff suggests that Defendants could have done more. Specifically, Plaintiff contends that Defendants could have used a rapid antigen test for every employee as they entered the facility. (*Id.*) But that is not the standard. The Eighth Amendment does not require that prison officials take every possible step to mitigate a risk.[9] *Wilson*, 961 F.3d at 844.

---

[9] Moreover, Plaintiff overstates the availability of rapid antigen tests during the fall of 2020.  To accommodate Plaintiff's proposal would have required thousands of rapid antigen tests every day. Plaintiff apparently labors under the false impression that COVID-19 testing kits were readily available. That was not the case. The nation faced several shortages of testing kits during 2020 and since. *See, e.g.*, GAO, *COVID-19: Urgent Actions Needed to Better Ensure an Effective Federal Response*, https://www.gao.gov/products/gao-21-191 (Nov. 30, 2020) ("In September 2020, GAO reported that ongoing constraints with the availability of certain types of personal protective equipment (PPE) and testing supplies remain due to a supply chain with limited domestic production and high global demand. In October 2020, GAO surveyed public health and emergency management officials from all states . . . and found . . . about one-third to one-half [of states]

### b.  Alcohol-based sanitizer

Under the DOMs, MDOC staff was permitted to use alcohol-based sanitizer. Prisoners were not. Plaintiff suggests that failing to permit prisoners to use alcohol-based sanitizer evidences deliberate indifference to the COVID-19 risk. That was also the claim made by the plaintiffs in *Cameron v. Bouchard*. Based on that claim, the trial court entered a temporary restraining order compelling the Oakland County Jail to provide alcohol-based sanitizer to the plaintiffs. Am. Op. & Order, *Cameron v. Bouchard*, No. 2:20-cv-10949 (E.D. Mich. Apr. 17, 2020), (ECF No. 21). The court backed off of that position and eliminated that requirement from the subsequent preliminary injunction order. Order, *Cameron v. Bouchard*, No. 2:20-cv-10949 (E.D. Mich. May 21, 2020), (ECF No. 94, PageID.3060–61). Nonetheless, the Sixth Circuit Court of Appeals vacated even that limited order concluding that under *Wilson*, the jail had reasonably responded to the COVID-19 risk even without providing the alcohol-based sanitizer sought by the prisoners. *Cameron v. Bouchard*, 815 F. App'x 978, 988 (6th Cir. 2020). The Sixth Circuit reached that conclusion even though the CDC had recommended that correctional facilities allow "for alcohol-based sanitizer throughout the facilities . . . ." *United States v. Kennedy*, 449 F. Supp. 3d 713, 716 (E.D. Mich. 2020).

### c.  Cleaning and disinfecting frequently touched surfaces

The DOMs called for the use of disinfectant; however, the use of bleach was limited to times when MDOC staff was present to supervise. Plaintiff's complaint is directed to Defendants' failure to permit the unlimited use of bleach by prisoners. The *Cameron* TRO did not require

---

reported shortages in . . . testing supplies."). Notwithstanding the Court's ability to take judicial notice of these facts under Rule 201 of the Federal Rules of Evidence, the information in this paragraph plays no role in the Court's decision. Instead, this information merely provides context and additional information to a prisoner who is incarcerated amidst an ongoing deadly pandemic. *C.f. United States v. Mathews*, 846 F. App'x 362, 364 n.3 (6th Cir. 2021).

bleach. The preliminary injunction required that surfaces be cleaned with "bleach-based cleaning agents." Order, *Cameron v. Bouchard*, No. 2:20-cv-10949 (E.D. Mich. May 21, 2020), (ECF No. 94, PageID.3060–61). But such cleaning was to occur under the oversight of "correctional staff." *Id*. The Sixth Circuit vacated even that requirement—which parallels the DOM here—as going beyond what was required under *Wilson*. *Cameron v. Bouchard*, 815 F. App'x 978, 988 (6th Cir. 2020). For the same reasons that the *Cameron* prisoners could not prevail on their "bleach" claim, Plaintiff cannot prevail on his.

### d.     Increased spacing

Plaintiff does not fault Defendants for failing to specify the necessary spacing. Instead, he complains that "staff members" never enforced the "every other seat seating arrangement in the chow hall." (2d Am. Compl., ECF No. 24, PageID.357.) Plaintiff also complains that the required spacing could not be maintained in the cubicles. (*Id.*, PageID.357–358.)

Plaintiff is plainly correct that incarceration limits the ability to comply with the CDC's recommended spacing guidelines. But that is not the product of some failure in Defendants' response to the pandemic; it is the very premise of that response. As the United States District Court for the Eastern District of Michigan noted in *Kennedy*:

> On March 23, 2020, the Centers for Disease Control and Prevention (CDC) acknowledged that correctional and detention facilities "present[ ] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html [Hereinafter "CDC Guidance 3/23/2020"]. Specifically, the CDC noted that many detention conditions create a heightened risk of danger to detainees. These include: low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing). *Id.*

17

*Kennedy*, 449 F. Supp. 3d at 715–16. The personal protective equipment, the cleaning, the increased efforts to maintain hygiene, the quarantine and isolation requirements, the limits on transfer, the testing, the screening—all of the other elements mandated by the DOMs are intended to address the risk of COVID-19 transmission that is simply inherent in the congregate setting of a correctional facility. The fact that Defendants cannot ensure proper spacing at all times does not, therefore, suggest that they are deliberately indifferent to the risk of COVID-19 transmission. Moreover, Plaintiff does not allege that Defendants knew and disregarded the alleged failure of other "staff members" to enforce the seating arrangement in the chow hall. Accordingly, Plaintiff has failed to allege the requisite subjective prong with regard to that claim.

> **e.    Failure of healthcare staff to make regular rounds prior to positive testing and quarantine**

Plaintiff next contends that MDOC healthcare staff should have been making regular rounds in all units to seek out symptoms indicative of COVID-19. Plaintiff contends that prisoners "withdrew from exposing that they had symptoms." (2d Am. Compl., ECF No. 24, PageID.360–361.) Plaintiff does not explain how nurses regularly conducting rounds would have been any more successful than a prisoner's cubicle-mates in discovering symptoms that a prisoner was determined to hide. Nor does Plaintiff explain how these Defendants disregarded a risk simply because they did not contrive some way to overcome a prisoner's inclination to conceal symptoms. Accordingly, Plaintiff's complaint regarding the failure of healthcare staff to conduct rounds fails to state a claim against these Defendants.

> **f.    Failure to order vitamins in anticipation of COVID-19 infections**

Plaintiff alleges: "Defendants Washington, Brown, and Yukins or McKee had vast amounts of information that demonstrate an ind[i]spensible need for the vitamins known to assist in boosting the immune system, however, without reason, they failed to adequately prepare to service

18

the population with those needed medical supplies." (*Id.*, PageID.361.) Plaintiff does not identify the vitamins. Plaintiff's conclusory allegation is not supported by any facts. There is nothing alleged to suggest that any of these Defendants knew of a need for vitamins to fight COVID-19 infection; if, indeed, there is such a need at all. Thus, there are no facts alleged to support the inference that these Defendants were aware of a risk that followed failure to secure such vitamins in anticipation of such infections or that these Defendants disregarded such a known risk—or even that there was any difficulty in obtaining the vitamins.[10] For all of these reasons, Plaintiff has failed to state a claim for violation of his Eighth Amendment rights.

### 3.  Respondeat superior liability

For the reasons set forth above, the Court concludes that Plaintiff has failed to allege facts that suffice to state a claim that any of the named defendants violated Plaintiff's constitutional rights by their direct action. Because each of the named defendants holds a supervisory position, however, and because Plaintiff alleges inappropriate conduct by persons they supervise, it is possible that Plaintiff intends to hold the named defendants accountable for the conduct of their subordinates.

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can

---

[10] Plaintiff attaches the "Vitamin History of Jonathan Good."  (ECF No. 3-22.)  The information indicates that Good took zinc sulfate, Vitamin $B_1$, Vitamin C, Vitamin $D_3$, and a multi-vitamin. (*Id.*)

supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

The Sixth Circuit has summarized the minimum required to constitute active conduct by a supervisory official:

> "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee,* 199 F.3d at 300 (emphasis added) (internal quotation marks omitted). We have interpreted this standard to mean that "at a minimum," the plaintiff must show that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

*Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (quoting *Shehee*, 199 F.3d at 300, and citing *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008)); *see also Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995) (citing *Rizzo v. Goode*, 423 U.S. 362, 375–76 (1976), and *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)); *Walton v. City of Southfield*, 995 F.2d 1331, 1340 (6th Cir. 1993); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).

Plaintiff fails to allege any facts showing that Defendants encouraged or condoned the conduct of their subordinates, or authorized, approved or knowingly acquiesced in the conduct. Indeed, he fails to allege any facts to suggest that Defendants could be held responsible under § 1983 for the conduct of their subordinates.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C.

§§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610–11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.


Dated:   __March 23, 2022__                          __/s/ Hala Y. Jarbou_____
                                                                             HALA Y. JARBOU
                                                                             UNITED STATES DISTRICT JUDGE